**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:05cr195 |
| | ) | |
| EVAN R. WEAVER | ) | |

**TENTATIVE FINDINGS AND RULINGS**

Defendant Evan R. Weaver ("Defendant") has filed his POSITION OF THE DEFENDANT WITH RESPECT TO PRESENTENCE REPORT ("Statement of Position") (*Document No. 10*) in which he objects to the recommended application of the United States Sentencing Guidelines ("USSG") as set forth in the Presentence Investigation Report ("PSI"). The government has filed the POSITION OF THE GOVERNMENT WITH RESPECT TO THE PRESENTENCE REPORT ("Government's Position") (*Document No. 9*) in which it objects to the recommended application of the Guidelines.

Defendant has also filed DEFENDANT'S MOTION FOR SENTENCING OUTSIDE OF THE SUGGESTED RANGE OF THE UNITED STATES SENTENCING GUIDELINES, with brief in support ("Motion" and "Brief," respectively; *Document Nos. 13 & 14*), and the government has filed a response in opposition thereto (*Document No. 16*).

Although the recent decision of United States Supreme Court in *United States v. Booker*, __ U.S. __, 125 S. Ct. 738 (2005), has held that the Sentencing Guidelines are no longer mandatory, the "remedial majority" opinion in the case instructs that the Sentencing Guidelines must still be taken into account pursuant to 18 U.S.C. § 3553(a) when fashioning an appropriate sentence. *See Booker*, 125 S. Ct. at 757. It remains appropriate, therefore, in this case to consider and resolve any Sentencing Guidelines disputes in order to determine a recommended sentencing range for Defendant, which will be one of the § 3553(a) factors to be considered in the imposition of an appropriate sentence.

In accordance with § 6A1.3 of the USSG and Local Criminal Rule of Court 32.1(H), the Court issues the following Tentative Findings and Rulings with respect to the applicability of the USSG sentencing factors in dispute:

1.      On July 14, 2005, pursuant to a written plea agreement, Defendant waived his right to an indictment and entered a plea of guilty to a two-count Information.  Both counts of the Information charged Defendant with Bank Fraud, in violation of 18 U.S.C. § 1344(1).

2.      Count I charged that in 1999, Defendant, without authorization, opened a checking account with PNC Bank in the name of Family Practice Medical Associates South ("FPMAS"), which was his employer at the time.[1]  Defendant thereafter deposited checks payable to FPMAS into the account and withdrew approximately $25,581.03 from the account.  Said funds were withdrawn through the use of automatic teller machines, an account check card, and withdrawal slips, and were ostensibly converted to Defendant's personal use.

3.      Count II charged that from September 4, 2001 to January 3, 2002, Defendant used five blank checks to withdraw a total of $9,269.67 from the FPMAS account.  Again, Defendant ostensibly converted said funds to his personal use.

4.      A Presentence Investigation Report ("PSI") was prepared by the Probation Office on September 8, 2005, with an Addendum to the PSI on October 5, 2005.

5.      In the plea agreement "[t]he parties stipulate that the 2000 Edition of the Sentencing Guidelines apply in this case, and that the loss for calculation of the offense level under the Sentencing Guidelines in this case is more than $120,000.00 but not more than $200,000.00."  However, the PSI calculated Defendant's potential sentence under the 2001 edition of the Guidelines, which resulted in an increased total offense level.  PSI at ¶ 14; Stmt. of Pos. at ¶ 9.[2]  The plea agreement also provides that "[t]he facts relevant to sentencing shall be determined initially by the United States Probation Office and finally by the United States Court by a preponderance of the evidence."

---

[1]     The account number was 1009095338.

[2]     In the Addendum the Probation Officer states that she "cannot ignore the incorrect application of the Guidelines manual or ignore specific sections of the manual in order to comply with a stipulation in a plea agreement, and the sentencing guidelines are clear on which edition is to be used."

6. Defendant contends that "the 2000 edition is correct in that it was stipulated to by the parties and the use of the 2000 edition of the [Guidelines] was an essential element in Mr. Weaver's decision to enter a guilty plea." Stmt. of Pos. at ¶ 9. Defendant also asserts that "[t]he 2000 edition more accurately reflects the extent of Mr. Weaver's criminal activity." *Id*. at ¶ 10. The government "contends that the court should use the 2000 Edition of the guidelines manual...," and observes that "in working out an appropriate plea agreement in this case, it was believed that the 2000 edition was more fair and appropriate since only an isolated part of the charged criminal conduct extended beyond November 1, 2001." Gov't. Pos. at ¶ 1.[3]

7. The default rule is that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." USSG § 1B1.11(a) (2004). However, "[i]f the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." USSG § 1B1.11(b)(1).[4] Additionally, "[t]he Guidelines Manual in effect on a particular date shall be applied in its entirety," and "[t]he court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual." USSG § 1B1.11(b)(2).[5] The Court observes that the parties' stipulation as to the applicable edition of the Guidelines is not binding on the Court. *See United States v. Griswold*, 57 F.3d 291, 294 & n.3 (3d Cir. 1995).

8. The Court finds and rules that it is appropriate to apply the 2000 edition of the Guidelines in this case. Both parties urge the Court to apply the 2000 edition, the plea agreement expressly provides for its application, it is clear to the Court that the 2000 edition

---

[3] The government has no other objection to the PSI.

[4] The PSI reflects that application of an earlier edition of the Guidelines would be "less onerous." PSI at ¶ 15.

[5] The 2000 edition of the Guidelines became effective as of November 1, 2000. The 2001 edition of the Guidelines became effective as of November 1, 2001.

covers the overwhelming majority of the time frame at issue, and the Court can identify no countervailing reason to apply the 2001 edition.[6] Accordingly, Defendant's sentence will be calculated under the 2000 edition of the Guidelines.

    9. Defendant objects to paragraph 6 of the PSI, which reflects that he was terminated from his position with FPMAS. Defendant contends that he voluntarily resigned his position, and the Addendum "concedes that FPMAS did indeed state that the defendant resigned to take another position ..." However, no finding regarding this issue is necessary because this controverted matter will not affect or be taken into account in determining Defendant's sentence. *See* Fed. R. Crim. P. 32(3)(B) (a sentencing court "must - for any disputed portion of the presentence report or other controverted matter - rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing").

    10. Defendant "objects to the characterization that he opened PNC account number 1009095338 without the knowledge of the owners" of FPMAS. Stmt. of Pos. at ¶ 4. Defendant "further denies that he forged the signatures of the president and secretary of the company on the signature card." *Id*. These objections are somewhat surprising and disconcerting insofar as the Information to which Defendant pled guilty expressly charges that "the defendant ... without the knowledge or authority of the officers or owners of FPMAS, caused PNC to open a business checking account, number 1009095338, in the name of FPMAS at PNC." Information at ¶ 6. The Information also expressly charges that "the defendant ... provided an account signature card for account number 1009095338 to PNC which contained the signature of the defendant and the forged signatures of the president and the secretary of FPMAS, each of whom was to be an approved signatory on the account." *Id*. at ¶ 7.

---

  [6] The Court has found no authority for the proposition that it *cannot* honor the parties' stipulation as to the applicable edition of the Guidelines. The Court also observes that the Supreme Court's decision in *Booker* severed and excised "the provision of the federal sentencing statute that makes the Guidelines mandatory," and "makes the Guidelines effectively advisory." *Booker*, 125 S.Ct. at 756-57.

11. There is some authority in the Third Circuit that indirectly stands for the proposition that Defendant cannot challenge the facts set forth in an Information after a plea of guilty has been entered. *See United States v. Gallagher*, 183 F.2d 342, 344 (3d Cir.), *cert. denied*, 340 U.S. 913 (1951) ("Here the appellant ... pleaded guilty to the indictment. That plea constituted an admission of his guilt, a waiver of all nonjurisdictional defects and defenses, *and admitted all the facts averred in the indictment*. The appellant, therefore, could not be heard to challenge those facts in a habeas corpus proceeding.").

12. Irrespective of how the scheme was executed, these disputed facts are not material to Defendant's guilt,[7] the degree of his overall culpability for the offenses, or the sentence which will ultimately be imposed. Therefore, no finding is actually necessary because this controverted matter will also not affect or be taken into account in determining Defendant's sentence. *See* Fed. R. Crim. P. 32(3)(B).

13. Paragraph 7 of the PSI reflects the following:

> According to the victim company, they negotiated a settlement with the defendant. He agreed to make **full restitution in exchange for them not going to the police with their findings**. On July 22, 2002, $425,000 was paid to the victim company, and an additional $65,000 was paid to Dr. Thomas Schaefer, who was also a victim of criminal conduct. The source of this money was monies that the defendant's mother had received from a lawsuit filed after her husband died in a plane crash. According to FPMAS, this was a negotiated amount, and the actual amount stolen was determined by the company administrator and accountant to be approximately $440,000.

PSI at ¶ 7 (emphasis added).

14. Defendant asserts that "these payments were not an admission that the amount paid reflected criminal activity or culpability of Mr. Weaver," and that he "made these

---

[7] Under the Bank Fraud statute, 18 U.S.C. § 1344, "a defendant must execute, or attempt to execute, a scheme or artifice, intended to victimize a federal bank or federally insured bank by causing it an actual or potential loss of its own funds." *United States v. Thomas*, 315 F.3d 190, 206 (3d Cir. 2002). Additionally, "[w]here the scheme involves the mere withdrawal of funds in the bank's custody, the Government must show that the withdrawal exposed the bank to some form of liability as a result of the fraud." *Id*. Despite Defendant's factual objections, he does not contend that the elements of Bank Fraud were not satisfied by his plea of guilty.

payments in order to settle any potential civil liability that may have arisen as a result of his employment with [FPMAS]." Stmt. of Pos. at ¶ 5.

15. The Court recognizes that Defendant's payment of $490,000 to FPMAS and Dr. Schaeffer was not intended to be an admission that said amount was the amount actually stolen. Indeed, there is no evidence that $490,000 represents the amount that Defendant actually stole, or that by making said payments Defendant explicitly admitted to stealing that amount.[8] However, as to the motivation for the payments, it is difficult to believe that Defendant was motivated only by the intention or hope to avoid civil liability. Significantly, the PSI reflects that Defendant "agreed to make full restitution *in exchange for them not going to the police with their findings*." PSI at ¶ 7.[9] Defendant has not challenged the truth of that assertion, and the Court finds that Defendant's payment of restitution was motivated by a desire to avoid potential civil liability *and to avoid criminal responsibility for his conduct as well*.

16. Paragraph 46 the PSI states that Defendant was employed by DeAngelis Diamond Construction from July 2002 to May 2004; however, Defendant contends that his employment with that company began in July 2001. Stmt. of Pos. at ¶ 6. The Addendum concedes that the July 2002 start date is an error, and that Defendant's employment began July 2001. However, no finding is necessary because this controverted matter will not affect or be taken into account in determining Defendant's sentence. *See* Fed. R. Crim. P. 32(3)(B).

17. Paragraph 51 of the PSI states that Defendant was terminated from his employment with Paolicelli & Associates. Defendant, on the other hand, contends that he was "laid off by the company for business reasons." Stmt. of Pos. at ¶ 7. The Addendum does not address this objection. However, again this disputed fact is not material and no finding is necessary because this controverted matter will not be taken into account in determining Defendant's sentence. *See* Fed. R. Crim. P. 32(3)(B).

---

[8] The settlement agreement between Defendant and FPMAS is not of record.

[9] The PSI does not reflect how this matter eventually came to the attention of and prosecution by federal law enforcement officers.

       18.     Paragraph 53 of the PSI reflects the following:

> The defendant reported that in late 1995 or early 1996, his mother obtained a settlement from U.S. Air due to the death of her husband in a plane crash. He indicated that he did not know the amount she received, but believed it to be in the millions, but less than $8,000,000. Internet research confirmed that U.S. Air paid out millions of dollars to the families of place crash victims to settle lawsuits, and Lee Weaver died in the crash. The defendant stated that his mother gave him and his sister some of this money as a gift.

PSI at ¶ 53.

       19.     Defendant now asserts that "he does not know the amount his mother received in settlement from his father's death on U.S. Air flight 427," and that he "does not believe that his mother's settlement concerning his father's accident is relevant to these underlying proceedings." Stmt. of Pos. at ¶ 8. It may well be that Defendant does not know the exact amount that his mother received in the settlement, but it is undisputed that she received a significant sum of money (*i.e.*, in the millions) from the settlement, and said money has provided considerable financial support to Defendant. Irrespective of the total amount of the settlement and whether Defendant knows the exact details, the amount of money that Defendant has received from his mother is clearly relevant to Defendant's financial condition, his ability to pay a fine, and his contention that his payment of full restitution amounts to extraordinary acceptance of responsibility. Whether Defendant is aware of the total amount of the settlement is not material and no finding is necessary. However, Defendant's objection to the relevance of information regarding the settlement is overruled.

       20.     Defendant contends that "[h]is immediate remorse and payment of restitution, amounting to more than $190,000 more than could have been proven at trial or a sentencing hearing amount to extraordinary acceptance of responsibility on his part and the court should consider a downward departure from the recommended sentencing guideline range pursuant to [USSG] § 5K2.0 and <u>United States v. Lieberman</u> ..." Motion at ¶ 11. Defendant also points out that "immediately upon being confronted with his crime, [he] paid for an audit to determine the amount of the money he misappropriated," that "[e]ven though he disagreed with the amount of the audit, he paid restitution in the amount of $490,000 in July 2002," and that he

"has paid roughly 200 percent of the amount stipulated as relevant conduct" in this case. Brief at p. 11.

21. In *United States v. Lieberman*, 971 F.2d 989, 996 (3d Cir. 1992), the United States Court of Appeals for the Third Circuit held that "a sentencing court may depart downward when the circumstances of a case demonstrate a degree of acceptance of responsibility that is substantially in excess of that ordinarily present." However, the court of appeals cautioned that "the incidence of departure based on degree of acceptance of responsibility must necessarily be limited, lest the unusual case become the ordinary one." *Id*.

22. *Lieberman* involved a vice president of a bank who pled guilty to one count of "bank embezzlement" and one count of attempted income tax evasion. The relevant facts are as follows:

> Between late 1985 and January 1990, Lieberman engaged in approximately 36 separate transactions in which he transferred money from the bank's suspense account into his own checking account in amounts ranging from $1,000 to $7,500.
>
> \*\*\*
>
> In early 1990, Lieberman was confronted by bank officials concerning the improper transactions and immediately admitted his wrongdoing. He explained to managers of the bank how he was able to avoid detection of the transfers and resigned from his position as vice president on January 30, 1990. He went to the FBI to admit his embezzlement from the bank.
>
> \*\*\*
>
> Although Lieberman pled guilty to a charge that he embezzled approximately $94,000, and the plea agreement stipulated that the loss to the bank was between $50,001 and $100,000, Lieberman entered into a consent judgment with the bank ... whereby he agreed to pay the bank $128,442.37 along with pre-judgment interest in the amount of $11,967.04.

*Id*. at 991. The district court granted Lieberman an additional 1-level reduction in his offense level because he admitted his guilt as soon as he was confronted, immediately began to make restitution, admitted the full amount that he thought was owed, and agreed to a larger amount of restitution than that asserted by the bank, including interest. *Id*. at 994. The court of appeals affirmed the district court's decision to depart downward under these circumstances. *Id*. at 996.

23. The Court finds and rules that Defendant's actions "demonstrate a degree of acceptance of responsibility that is substantially in excess of that ordinarily present" in similar cases. *Lieberman*, 971 F.2d at 996. In this case Defendant admitted his guilt to the victims, paid for an audit to determine the total amount of loss to the victim(s), and has paid full restitution to the victim(s) in a timely manner. Therefore, the Court will grant Defendant's request for a downward departure on the basis of extraordinary acceptance of responsibility.

24. The Court is cognizant of the fact that funding for the restitution came from a loan from Defendant's mother, rather than from a sale of Defendant's own assets or an equivalent personal sacrifice. The Court also observes that the payment of restitution in excess of the amount of the audit was, at least in part, in consideration for keeping this matter below the radar screen of law enforcement authorities.[10] In the Court's view these facts considerably detract from the *extent* of an appropriate downward departure, but do not preclude a downward departure.

25. The Court finds and rules that a downward departure of one level is warranted for Defendant's extraordinary acceptance of responsibility. Defendant's acceptance of responsibility, through the payment of full restitution, is commendable and warrants such a departure. However, the fact that the funds came from Defendant's mother, and the fact that Defendant initially attempted to sweep this matter "under the rug," so to speak, limit the extent of such a departure to an appropriate one level reduction.

26. Defendant also contends that his offense level "greatly overstates his criminal conduct" because he "paid in excess of $190,000 in restitution over the amount charged in the offense," and because "there is no actual loss to the victims." Brief at 11-12.

27. The Court rejects this argument. The offense level determined under the 2000 edition of the Guidelines reflects a stipulated amount of loss. The fact that Defendant's

---

[10] By contrast, the defendant in *Lieberman* "went to the FBI to admit his embezzlement from the bank," rather than negotiating a deal with the victim to avoid criminal penalties for his conduct. *Lieberman*, 971 F.2d at 991. This distinction significantly affects the extent of the downward departure that Defendant should receive.

restitution payment was nearly double the stipulated loss amount not mean that the stipulated loss amount fails to reflect his culpability. Moreover, the fact that Defendant paid restitution does not negate the fact that he stole the money. It is also relevant that the plea agreement includes a stipulation that Defendant will receive a 2-level increase for abuse of a position of trust, as well as a 2-level increase for more than minimal planning. Under these circumstances, and in light of the fact that Defendant's total offense level is largely the product of stipulations, the Court finds and rules that Defendant's offense level does by no means greatly overstate his criminal conduct.

28. Under the 2000 edition of the Guidelines, Defendant's base offense level is 6. USSG § 2F1.1(a) (2000). Because the loss amount is more than $120,000, but not more than $200,000, the base offense level is increased by 7. § 2F1.1(b)(1)(H). Defendant receives an increase of two levels for "abuse of a position of trust," § 3B1.3, and an increase of two additional levels for "more than minimal planning." § 2F1.1(b)(2). Thus, prior to downward adjustments Defendant's adjusted offense level is 17. Defendant receives a 3 level reduction for acceptance of responsibility, and a downward adjustment of 1 level for extraordinary acceptance of responsibility, which yields a total offense level of 13. A total offense level of 13 with a criminal history category of I produces an advisory guideline range of 12-18 months under the 2000 edition of the Guidelines.

29. The Court has fully considered the remaining factors set forth in 18 U.S.C. § 3553(a) as they relate to Defendant and the facts of this case.

30. Defendant's Motion is hereby GRANTED to the extent that it seeks a downward departure for extraordinary acceptance of responsibility, but DENIED in all other respects. In accordance with the foregoing Tentative Findings and Rulings, Defendant will be sentenced based on an advisory guideline range of 12-18 months under the 2000 edition of the Guidelines.

The sentencing hearing will proceed as scheduled on **Friday, December 9, 2005 at 9:30 a.m.** in accordance with the foregoing tentative findings and rulings.  SO ORDERED this 8th day of December, 2005.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:   Dennis P. Kissane, AUSA
    Email: dennis.kissane@usdoj.gov

    Robert R. Leight, Esquire
    Email: RRL@PBandG.com

    Jennifer Beard, U.S. Probation Officer
    VIA FAX/ 412-395-4864